# In the United States Court of Federal Claims

### No. 16-348C
### (Filed: May 26, 2016)[1]
### (Bid Protest)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | |
| | * | 28 U.S.C. § 1491(b); Bid |
| SPECTRUM COMM, INC., | * | Protest; Permanent Injunction; |
| | * | FAR Part 8.405; Best Value |
| Plaintiff, | * | Procurement; Tradeoff |
| | * | Decision; Failure of Source |
| v. | * | Selection Authority to Follow |
| | * | Source Selection Evaluation |
| THE UNITED STATES, | * | Board's Recommendation. |
| | * | |
| Defendant, | * | |
| | * | |
| and | * | |
| | * | |
| JACOBS TECHNOLOGY INC., | * | |
| | * | |
| Intervenor. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | |

David Y. Yang, David M. Nadler, and Philip E. Beshara, Blank Rome LLP, 1825 Eye Street, NW, Washington, D.C. 20006-5403, for Plaintiff.

Benjamin Mizer, Robert E. Kirschman, Jr., Elizabeth Hosford, and Mariana Acevedo, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, P.O. Box 480, Ben Franklin Station, Washington, D.C. 20044, for Defendant. Erika L. Whelan Retta, Major George M. Ebert, and Kerry A. Carlson, United States Air Force, Of Counsel.

Robert J. Symon and Aron C. Beezley, Bradley Arant Boult Cummings LLP, 1615 L. Street, N.W., Suite 1350, Washington, D.C. 20036, for Intervenor.

---

[1]    The Court issued this opinion under seal on April 28, 2016, and directed the parties to file proposed redactions by **May 6, 2016.**  The Court publishes this Opinion indicating redactions by asterisks [***].

---

## OPINION AND ORDER

---

**WILLIAMS**, Judge.

This post-award bid protest comes before the Court on Plaintiff Spectrum Comm, Inc.'s ("Spectrum") motion for a permanent injunction. Plaintiff challenges the United States Department of the Air Force's ("Air Force") award of a contract for support services for the Air Force Wideband Enterprise Terminals ("AFWET") Program, to Intervenor, Jacobs Technology, Inc. ("Jacobs"). Spectrum contests the Air Force's award on three grounds:

1) The Air Force's corrective action upgrading Jacobs' past performance rating from "Very Good" to "Exceptional" was arbitrary and capricious and without a rational basis;

2) The Air Force failed to comply with the RFQ requirements in making its best value determination by not giving due weight to the "Mission Capability" technical factor; and

3) The Air Force improperly converted the RFQ from a best value into a lowest-priced technically acceptable procurement.

Plaintiff requests that the Court enter a permanent injunction prohibiting the Air Force from allowing Jacobs to perform and directing the Air Force to make award to Spectrum.

On April 5, 2016, the Court orally denied Plaintiff's motion for a preliminary injunction, finding that Plaintiff had not shown a likelihood of success on the merits and that significant national security interests warrant maintaining the contract award schedule.

Given the extensive briefing and oral argument at the preliminary injunction phase, the Court dispensed with further briefing. See Tr. 68.

## Findings of Fact[2]

### A Critical Program

The AFWET Program is a $1.3 billion operation that provides worldwide satellite communications to support military missions of the United States and Coalition forces. AR 79; Patterson Decl. ¶¶ 1, 2. AFWET's responsibilities include maintaining 30 large satellite communications antennae at 21 sites - - called Geographically Separated Units ("GSUs") - - located around the world. AR 79; Patterson Decl. ¶ 2. These antennae provide "long haul satellite communications over Super High Frequency satellites . . . and serve as the primary

---

[2]     These findings of fact are derived from the Administrative Record ("AR"). Additional findings of fact are in the Discussion. The Court does not correct grammatical or typographical errors in quotations from the record.

Military Satellite Communications backbone for the [Department of Defense]." AR 79. As such, the "AFWET terminals provide communication links necessary to meet crucial national strategic and tactical command, control, communications and intelligence requirements." Id.

## The Request for Quotation

On June 5, 2015, the Air Force issued Request for Quotation ("RFQ") No. 964304, requesting quotations for product support services for the modernization of the enterprise terminals for the AFWET Program at the Program's main office at Hanscom Air Force Base, its associated GSUs, and operating locations. AR 11. Under the RFQ, the contractor was to provide support services under the "Professional Engineering Services (PES) Government Services Administration (GSA) contract." Id. As the RFQ was the second iteration of the product support services quotation, the Air Force titled it "Product Support Services 2" or "PSS2." Id. Spectrum was the incumbent.

The RFQ called for a six-month base period and five options of six months each. Id. The six-month base period was originally set to begin on August 15, 2015, and run through February 14, 2016. AR 16. Award was to be made in accordance with FAR Part 8.405, Ordering Procedures for Federal Supply Schedules. AR 11; 48 C.F.R. § 8.405 (2011).

FAR Part 8.405-2 addresses evaluating best value procurements as follows:

(d) Evaluation. The ordering activity shall evaluate all responses received using the evaluation criteria provided to the schedule contractors. The ordering activity is responsible for considering the level of effort and the mix of labor proposed to perform a specific task being ordered, and for determining that the total price is reasonable.

48 C.F.R. § 8.405-2(d) (2012).

Unlike competitive procurements under FAR Part 15, procurements under FAR Part 8.405 only require the following minimum documentation:

(f) Minimum documentation. The ordering activity shall document—
    (1) The schedule contracts considered, noting the contractor from which the service was purchased;
    (2) A description of the service purchased;
    (3) The amount paid;
    (4) The evaluation methodology used in selecting the contractor to receive the order;
    (5) The rationale for any tradeoffs in making the selection;
    (6) The price reasonableness determination required by paragraph (d) of this subsection;
    (7) The rationale for using other than—
        (i) A firm-fixed price order; or
        (ii) A performance-based order; and
    (8) When an order exceeds the simplified acquisition threshold, evidence of compliance with the ordering procedures at 8.405–2(c).

3

48 C.F.R. § 8.405-2(f).  Compare 48 C.F.R. § 15.305 (2014).

As required by FAR Part 8.405-2(b), the Air Force attached the AFWET Performance Work Statement ("PWS") to the RFQ that detailed the services required.  AR 76-104.  The PWS defined the project scope as:

> The AFWET Program Office requires product support services to implement the [Modernization of Enterprise Terminals] and other smaller modernization actions in order to sustain existing Wideband Enterprise Terminals.

> Required services include: implementation project management, integration of diverse implementation efforts, civil engineering expertise to implement site preparation activities, logistics expertise to integrate system into [the Air Force] sustainment structure and support field units, [Satellite Communication] equipment expertise for training operators/maintainers, and installation expertise to ensure systems are installed correctly.

AR 79.  To effect these services, the RFQ required offerors to provide the following categories of personnel:

- Senior Engineering and Integration Lead
- Senior [Satellite Communications] Implementation Leads
- Mid-Level [Satellite Communications] Installation Leads
- Civil Engineering Implementation Leads
- Senior Logistics Implementation Leads
- Mid-Level Logistics Implementation Leads
- Senior Transportation Logistics Lead
- Mid-Level Project Integrator
- Senior Equipment Training  Lead

AR 12-13, 81.  The PWS detailed the requirements for each position.  AR 82-93.

The RFQ provided that award was to be made on a best value basis according to the following criteria:

> a.  Mission Capability is the most important factor.  Past Performance is less important than Mission Capability but more important than Cost/Price.  Mission Capability and Past Performance combined are significantly more important than Cost/Price; however, Cost/Price will contribute substantially to the selection decision.

> b.  Mission Capability will be measured by how well the labor codes and descriptions selected by the offerors match Government requirements as detailed in the PWS.  Failure to meet minimum requirements as defined in the PWS could result in elimination from competition.

     c. Past Performance will be measured by relevant [Contractor Performance Assessment Reports][3] submitted within the past 2 years from the release of the RFQ and research among other Government customers.

AR 11-12.

With respect to Past Performance, the RFQ required, in addition to the Contractor Performance Assessment Reports ("CPARs"), that:

The offeror[s] . . . include contract information from the three most recent and relevant contracts in their quotation. This information is to include contract number, dollar value, a short description of the services provided and contact information.

AR 12.

Beyond the RFQ, the Air Force developed a color-coded rating scale to evaluate the two technical factors: Mission Capability and Past Performance, but did not share this rating scale with offerors. Compare AR 152-54, with AR 11-12. For Mission Capability, the scale provided:

| RATING SCALE | |
| --- | --- |
| **Color Rating** | **Definition** |
| EXCEPTIONAL [blue] | Performance meets contractual requirements and exceeds many to the Government's benefit |
| VERY GOOD [purple] | Performance meets contractual requirements and exceeds some to the Government's benefit |
| SATISFACTORY [green] | Performance meets contractual requirements |
| MARGINAL [yellow] | Performance does not meet some contractual requirements |
| UNSATISFACTORY [red] | Performance does not meet most contractual requirements |

AR 152-53. The "evaluation team" was to provide an overall "color rating" for Mission Capability based on comparing the "labor code descriptions selected by the contractor and the position descriptions as described in the PWS." AR 12.

For Past Performance, the Air Force used a similar rating scheme:

---

[3] Contractor Performance Assessment Reports ("CPARs") are past performance evaluations prepared by an agency and housed in an electronic Governmentwide evaluation reporting tool, the Past Performance Information Retrieval System ("PPIRS"). 48 C.F.R. §§ 42.1501, 42.1502.

| RATING SCALE | |
|---|---|
| **Color Rating** | **Definition** |
| EXCEPTIONAL [blue] | Based on the offeror's recent/relevant performance record, the Government has a very high expectation that the offeror will successfully perform the required effort. |
| VERY GOOD [purple] | Based on the offeror's recent/relevant performance record, the Government has a high expectation that the offeror will successfully perform the required effort. |
| SATISFACTORY [green] | Based on the offeror's recent/relevant performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort. |
| MARGINAL [yellow] | Based on the offeror's recent/relevant performance record, the Government has a low expectation that the offeror will successfully perform the required effort. |
| UNSATISFACTORY [red] | Based on the offeror's recent/relevant performance record, the Government has no expectation that the offeror will be able to successfully perform the required effort. |

AR 153-54.

For Cost/Price, the Air Force's internal rating scale provided:

Cost/Price will be evaluated for reasonableness. In evaluating cost/price, the Cost/Price Evaluation Team will determine fair and reasonableness based upon historical costs, the previous iteration of [product support services], and the Program Office internal government cost estimate.

AR 154.

**The Air Force's Evaluation and Award**

The RFQ required offerors to submit quotations electronically by July 6, 2015, at 12:00 p.m., and each quotation was to remain valid for 120 days. AR 148. Three offerors timely submitted quotations: Spectrum, Jacobs, and Honeywell Technology Solutions Inc. ("Honeywell"). AR 593. The offers were first evaluated by a Source Selection Evaluation Board ("SSEB") and then independently reviewed by the Contracting Officer, who acted as the Source Selection Authority. AR 623

**The Source Selection Evaluation Board's Recommendation**

On September 18, 2015, the SSEB chairperson, AFWET Program Manager Shawn M. Patterson, issued a Proposal Analysis Report ("PAR") for the RFQ. AR 614. The PAR contained the SSEB's evaluation of both price and technical factors. AR 596-614. With respect to "Source Selection Procedures," the PAR noted:

This is a competitive best-value trade-off source selection conducted in accordance with FAR Part 8. The Government will select the best overall offer,

6

based upon an integrated assessment of Mission Capability, Past Performance, and Cost/Price. The contract may be awarded to the offeror who is deemed responsible [in accordance with] the FAR, as supplemented, whose proposal conforms to the solicitation's requirements to include all stated terms, conditions, and all other information required on the [RFQ] based on the evaluation factors and sub factors that represent the best value to the Government. <u>This may result in an award to a higher rated, higher priced offeror, where the decision is consistent with the evaluation factors, and the Source Selection Authority (SSA) determination that the technical and/or overall business approach and/or past performance of the higher price offeror outweighs the cost difference. The SSA will base the source selection decision on an integrated assessment of proposals against all source selection criteria in the solicitation.</u>

AR 588 (emphasis added).

The SSEB review occurred between July 6, 2015 and August 3, 2015. AR 614. Following review of each offer, the SSEB concluded the following:

| Evaluation Results | | | |
|---|---|---|---|
| **Evaluation Criteria** | **Jacobs** | **Honeywell** | **Spectrum** |
| Factor 1 – Mission Capability | SATISFACTORY [green] | UNSATISFACTORY [red] | VERY GOOD [purple] |
| Factor 2 – Past Performance | VERY GOOD [purple] | MARGINAL [yellow] | EXCEPTIONAL [blue] |
| Factor 3 – Price | **$7,971,137.36** | **$11,177,770.53** | **$8,369,751.55** |

AR 596.

For Mission Capability the SSEB compared the personnel listed by each offeror with the nine position categories described in the PWS. AR 589-90. The SSEB also defined sub-ratings, based on color - - purple, green, yellow, and red - - by which each Mission Capability position would be evaluated. AR 590-91. Relevant here are the sub-factors for purple and green - - the sub-factor color ratings awarded to Spectrum and Jacobs, respectively, on Mission Capability:

**Purple: Able to perform duties at a very high level**
[1] Education: The position has an education background that is far over the minimum requirement (e.g. Master's vs. Bachelors)
[2] Years of Experience: The position has years of experience more than 2 years above what is desired
[3] Security Clearance: The position has a Security Clearance above the minimum requirement
[4] Ability to: The position description goes above and beyond the qualifications listed in the [Performance Work Statement]

**Green: Able to perform duties**
[1] Education:   The position has an education background that meets the minimum requirement
[2] Years of Experience: The position has years of experience within 1-2 years (over or under) of what is desired
[3] Security Clearance: The position meets the required Security Clearance
[4] [Professional Engineer]: The position has proposed a [Professional Engineer] (Civil Engineering Implementation Lead Only)
[5] Ability to: The position described aligns well with the qualifications listed in the [Performance Work Statement].

Id.  An overall "Very Good" rating was given to the RFQ positions with at least one "Purple" sub-rating and no ratings below "Green."  AR 590.  An overall "Satisfactory" rating was given to the RFQ positions that had all "Green" subratings, and no ratings below "Green."  Id.

The SSEB then rated Mission Capability for the nine position categories based on the color-rated sub-factors for Jacobs and Spectrum according to the following chart:

| Mission Capability Positions | | |
|---|---|---|
| **Position** | **Jacobs** | **Spectrum** |
| Senior Engineer and Integration Lead | VERY GOOD [1 purple; 3 green] | SATISFACTORY [4 green] |
| Senior [Satellite Communication] Implementation Lead | SATISFACTORY [4 green] | VERY GOOD [2 purple; 2 green] |
| Mid-Level [Satellite Communication] Installation Lead | SATISFACTORY [4 green] | VERY GOOD [2 purple; 2 green] |
| Senior Civil Engineering Implementation Lead[4] | SATISFACTORY [5 green] | VERY GOOD [1 purple; 4 green] |
| Senior Logistics Implementation Lead | SATISFACTORY [4 green] | VERY GOOD [1 purple; 3 green] |
| Mid-Level Logistics Implementation Lead | SATISFACTORY [4 green] | VERY GOOD [2 purple; 2 green] |
| Senior Transportation Logistics Implementation Lead | SATISFACTORY [4 green] | VERY GOOD [2 purple; 2 green] |
| Mid-Level Project Integrator | VERY GOOD [1 purple; 3 green] | VERY GOOD [1 purple; 3 green] |
| Senior Equipment Training Lead | SATISFACTORY [4 green] | VERY GOOD [1 purple; 3 green] |
| **Overall Assessment** | SATISFACTORY | VERY GOOD |

---

[4]      The Senior Civil Engineering Implementation lead had an additional sub-factor requirement that the position be held by a Professional Engineer, in addition to the four sub-factor requirements for all categories - - education, experience, security clearance, and ability to meet the requirements in the Performance Work Statement.  AR 590-91.

AR 596-600, 606-11.

Looking at the sub-ratings for Mission Capability, the SSEB awarded Jacobs two purple and 35 green ratings out of 37 sub-ratings, and Spectrum 12 purple and 25 green ratings out of 37 sub-ratings for Mission Capability.  Id.   Of Spectrum's 12 purple sub-ratings, 11 related to the sub-factors of experience and education, while one purple rating related to the proposed employee's ability to perform the PWS requirements for the Mid-Level Satellite Communications Installation Lead position.  AR 446-48.

The following charts illustrate the differences between Spectrum's and Jacobs' ratings on the experience and education sub-factors:

**Education Sub-factor Ratings**

| Position Title | Position Qualifications | Spectrum's Proposed Education Level | Jacobs' Proposed Education Level |
|---|---|---|---|
| Senior Engineering and Integration Lead | Master's in technical or engineering field (required) | Master's Degree [green] | Master's Degree [green] |
| Senior [Satellite Communications] Implementation Lead | Bachelor's in technical or engineering (preferred)/Master's (desired) | Master's Degree [purple] | Bachelor's Degree [green] |
| Mid-Level [Satellite Communications] Installation Lead | Bachelor's in technical or engineering field (preferred)/Master's (desired) | Bachelor's Degree [green] | Bachelor's Degree [green] |
| Senior Civil Engineering Implementation Lead | Bachelor's in Civil Engineering (required)/ Master's (desired) | Master's Degree [purple] | Bachelor's Degree [green] |
| Senior Logistics Implementation Lead | Bachelor's Degree (required) | Master's Degree [purple] | Bachelor's Degree [green] |
| Mid-Level Logistics Implementation Lead | Bachelor's Degree (required) | Master's Degree [purple] | Bachelor's Degree [green] |
| Senior Transportation Logistics Implementation Lead | Bachelor's Degree (required) | Master's Degree [purple] | Bachelor's Degree [green] |
| Mid-Level Project Integrator | Bachelor's Degree (required) | Bachelor's Degree [green] | Bachelor's Degree [green] |
| Senior Equipment Training Lead | Bachelor's (required) in technical or engineering field (preferred)/ Master's (desired) | Bachelor's Degree [green] | Bachelor's Degree [green] |

AR 446-48, 482-84.

**Experience Sub-factor Ratings**

| Position Title | Position Qualifications | Spectrum Proposed Education Level | Jacobs' Proposed Education Level |
|---|---|---|---|
| Senior Engineering and Integration Lead | 14 years applicable experience (desired) | 15 years [green] | 30 years [purple] |
| Senior [Satellite Communications] Implementation Lead | 12 years applicable experience | 15 years [purple] | 14 years [green] |
| Mid-Level [Satellite Communications] Installation Lead | 8 years applicable experience | 12 years [purple] | 8 years [green] |
| Senior Civil Engineering Implementation Lead | 14 years applicable experience | 15 years [green] | 14 years [green] |
| Senior Logistics Implementation Lead | 14 years applicable experience (desired) | 15 years [green] | 14 years [green] |
| Mid-Level Logistics Implementation Lead | 8 years applicable experience (desired) | 15 years [purple] | 8 years [green] |
| Senior Transportation Logistics Implementation Lead | 12 years minimum | 15 years [purple] | 14 years [green] |
| Mid-Level Project Integrator | 2 years minimum with project/schedule/resource management | 6 years [purple] | 5 years [purple] |
| Senior Equipment Training Lead | 8 years applicable (desired) | 12 years [purple] | 8 years [green] |

Id.

After Mission Capability, the SSEB turned to the offerors' past performance. For Jacobs, the SSEB found 50 Contractor Performance Assessment Reports ("CPARs"), reviewed seven, and ranked Jacobs' past performance as "Very Good (purple)," stating:

> Jacobs Technology Inc. has had substantial success on other relevant and similar contracts. Almost every area of each contract qualified as robust with only 1 rating below satisfactory in management of key personnel. Considering the research only uncovered one instance in which the contractor was marginal, and with a majority of the ratings at Exceptional, the evaluation team believes Jacobs Technology Inc. has shown to be very capable in executing similar contracts . . . . Although the majority of the ratings were marked as exceptional, the evaluation team felt that even one marginal rating on a government labor contract would put the AFWET Program Office at risk for less than exceptional performance.

Therefore, the evaluation team arrived at a consensus of **Very Good (Purple)** due to consistent ratings of Exceptional and Very Good in all areas of evaluation, but 1 Marginal Rating that negatively affected the offeror's overall rating.

AR 600; see AR 1517.

With respect to Spectrum, the SSEB found only five relevant CPARs, reviewed all five, and ranked Spectrum's past performance as "Exceptional (blue)," stating:

Spectrum Comm Inc. has had substantial success on other relevant contracts. Almost every area of each contract qualified as robust with only one rating below Very Good (purple) in schedule management. Therefore, Spectrum Comm Inc. has shown to be very capable in executing similar contracts. The evaluation team arrived at a consensus of **Exceptional (Blue)** due to consistent ratings of Exceptional (Blue) in all areas . . . . Due to consistent Exceptional (Blue) performances the Past Performance Evaluation Team is confident in their assessment of Exceptional (Blue).

AR 611.

The SSEB also found both Spectrum's price of $8,369,751.55 and Jacobs' price of $7,971,137.36 to be fair and reasonable based on the Independent Government Estimate of $8,763,639.21, as well as historical prices, and a comparison to other offerors' prices. AR 9, 611-12.

In conclusion, the SSEB wrote the following substantively identical overall assessments for Jacobs and Spectrum:

Quote received from Jacobs is found acceptable. No waivers or deviations to standard FAR/DFARS/AFFARS clauses were requested by Jacobs. A contract with Jacobs Technology is awardable, affordable, if applicable, and executable.

Quote received from Spectrum COMM is found acceptable. No waivers or deviations to standard FAR/DFARS/AFFARS clauses were requested by Spectrum. A contract with Spectrum COMM is awardable, affordable, if applicable, and executable.

AR 613.

On August 17, 2015, the SSEB chair, Mr. Patterson, recommended award to Spectrum, stating:

Spectrum received substantially better ratings in both Mission Capability and Past Performance (Very Good and Exceptional, respectively) than the lowest bidder (Satisfactory and Very Good, respectively). As per the [RFQ] Evaluation Criteria: "Mission Capability is the most important factor. Past Performance is less important than Mission Capability but more important than Cost/Price. Mission Capability and Past Performance combined are significantly more important than Cost/Price; however, Cost/Price will contribute substantially to the

11

selection decision." Based on this criteria and given Spectrum's superior ratings in the two most important areas, I believe Spectrum represents the best value for the government.

Although Spectrum's proposal came in at a total price $398,614.19 more expensive than that of the contractor with the lowest price, it was evaluated by the Cost/Price Evaluation Team as fair and reasonable. Spectrum's proposed pricing was below both [General Service Administration] schedule rates and the government's cost estimate. The Air Force Wideband Enterprise Terminals program is a $1.3 Billion program that depends on its product support team to integrate all program implementation activities in lieu of a prime contractor. The PSS2 contractor must meet an aggressive Joint schedule comprised of 25-30 concurrent projects at 22 global locations. Without top-notch support, this incredibly complex schedule is not achievable. As a Joint schedule, any perturbations also trigger substantial impacts to Army and Navy programs and budgets. This cost differential represents a mere 0.026% of the program's lifecycle cost. Therefore, I believe securing the superior contracted support justifies this relatively small premium, making Spectrum the best value for the government in supporting this critical program.

AR 587.

In the view of the SSEB Chair, the cost differential of $398,614.19 did not justify selecting Jacobs as the awardee based on the superior rankings Spectrum received in Mission Capability and Past Performance. Id. The SSEB Chair also considered the cost difference with respect to the entirety of the overall AFWET program - - 0.026% of $1.3 billion - - to justify accepting Spectrum's higher priced quotation. Id.

### The Source Selection Authority's Decision to Award the Contract to Jacobs

On September 18, 2015, Contracting Officer Filomena Gomez, acting as the Source Selection Authority ("SSA"), issued the Source Selection Decision Document, awarding the contract to Jacobs. AR 623, 627. Contracting Officer Gomez recognized that the procurement was to be conducted on a best value basis and based her selection "upon an integrated assessment of the quotes submitted" by the three offerors - - Jacobs, Honeywell, and Spectrum. AR 623. In declining to accept the SSEB's recommendation awarding the RFQ to Jacobs, Contracting Officer Gomez stated:

After performing my independent evaluation and assessment of the three offerors, I determined that both offerors are capable of performing the requirements of the PWS successfully. While I understand the aggressive schedules with multiple concurrent projects for the AFWET program and the SSEB's evaluation of Mission Capability and Past Performance sub-factors, I disagree with the recommendation. The factor ratings assigned to each awardable offeror and their comparative weight does not justify the higher price quote submitted by SpectrumC.

I determine that it is not in the best interest of the Government to pay an additional $398,614.19 for SpectrumC quote.

In summary, based on my integrated assessment of the mission requirements and all quotes in accordance with the evaluation criteria for the AFWET program PSS2 contract it is my decision that the quote submitted by JacobsTec represents the best overall value to the Government.

AR 627.  In awarding the RFQ to Jacobs, Contracting Officer Gomez considered the almost $400,000 price difference between Spectrum and Jacobs sufficient to justify award to Jacobs, despite Jacobs' lower rankings in Mission Capability and Past Performance.  Id.[5]

### Spectrum's First GAO Protest and the Air Force's Corrective Action

On October 23, 2015, following Contracting Officer Gomez's award of the RFQ to Jacobs, Spectrum filed a bid protest with the Government Accountability Office ("GAO"). Before reaching the protest merits, the Air Force decided to take corrective action on November 6, 2015, stating:

Based upon the allegations in the above referenced protest, the Government has decided to take corrective action with regard to its best value determination.  The SSA will review the source selection documentation and make a new best value determination.

AR 857.  The GAO dismissed Spectrum's first protest as academic.  AR 860-61.

On November 17, 2015, Contracting Officer Gomez re-awarded the RFQ to Jacobs, issuing a second Source Selection Decision Document.  AR 862-67.  In this second source selection, Contracting Officer Gomez reviewed each award factor - - Mission Capability, Past Performance, and Cost/Price - - individually.  Id.  At the outset, Contracting Officer Gomez dismissed the notion that there was a meaningful difference between Jacobs and Spectrum in the Mission Capability and Past Performance technical factors, stating:

While the ratings presented [by the SSEB] provide an appearance that the overall ratings received by SpectrumC for Mission Capability and Past Performance are significantly higher than the ratings received by JacobsTec, the reality is that the Offerors' overall capabilities are closer to each other than the color ratings would reveal.

AR 866.

Contracting Officer Gomez explained that the differences in Mission Capability between Jacobs and Spectrum represented minor differences in education and experience among its personnel for the positions listed in the RFQ, stating:

In the area of Mission Capaiblity, for example, SpectrumC received an overall rating of "Very Good" based on the fact that eight of its nine positions received individual ratings of "Very Good" and one position received a "Satisfactory"

---

[5]     The $400,000 difference encompassed the base and all option periods.

rating. However, two of SpectrumC['s] nine positions received a rating of "Very Good" solely based on the fact that SpectrumC exceeded the desired education level for these positions (Master's Degree offered while Bachelor's Degree was desired.) With two other positions, SpectrumC received a rating of "Very Good" based solely on the fact that they proposed to fill the position with an individual who exceeded the desired level of experience by a handful of years (the Mid-Level Project Integrator had 6 years of experience vs. the desired 2 years and the Senior Equipment Training Lead had 12 years vs. the desired 8 years of experience.) JacobsTec, on the other hand, received an overall rating of "Satisfactory" for Mission Capability based on the fact that two positions received an individual rating of "Very Good" and seven positions received an individual rating of "Satisfactory." While SpectrumC received a higher overall rating for Mission Capability than JacobsTec, I do not find the differences between the two offerors is so great as to justify paying an almost $400K premium for SpectrumC marginally superior quote under Mission Capability.

Id.

With respect to Past Performance, Contracting Officer Gomez considered Jacobs' and Spectrum's proposals to be "very similar" such that both contractors should have received an "Exceptional" rating, despite the SSEB's finding Jacobs' Past Performance should be considered only "Very Good." Id. Contracting Officer Gomez explained her disagreement with the SSEB, stating:

> In the area of Past Performance, the "Exceptional" rating received by SpectrumC was based on 17 CPAR individual ratings of "Exceptional", four ratings of "Very Good", and one rating of "Satisfactory." The Source Selection Team (SST)[6] assigned a rating of "Very Good" to JacobsTec under Past Performance based solely on the fact that they received one "Marginal" rating in a CPAR evaluation area. I do not concur with the SST's evaluation of JacobsTec's Past Performance and find that JacobsTec should have received an "Exceptional" rating under Past Performance. While I understand the SST's concern regarding this one "Marginal" rating, I find that on the whole, JacobsTec Past Performance Record is "Exceptional" in that the Government has a very high expectation that JacobsTec will successfully perform the required effort.

AR 866-67.

With respect to Cost/Price, the SSEB compared the almost $400,000 difference between Jacobs' and Spectrum's prices to the overall AFWET Program budget of $1.3 billion, whereas Contracting Officer Gomez compared offerors' prices against each other and without accounting for CLINs with maximum "not-to-exceed" values. AR 866. In doing so, Contracting Officer Gomez found that Spectrum's proposal represented a 6.3% markup over Jacobs' price, writing:

---

[6]     The Source Selection Team is also referred to as the Source Selection Evaluation Board or SSEB.

> In the area of Cost/Price, JacbosTec and SpectrumC quotes compared favorably to the Independent Government Estimate [$8,763,639.21].   SpectrumC quoted their published [General Services Administration ("GSA")] rates.   JacobsTec quoted discounts to their published GSA rates.   The difference in the quotes is reflected in their different rate quotes.   Twelve (12) of the (18) CLINs the Government requested a quote on had a not to exceed (NTE) value which offerors were instructed to complete at that price. Removing these 'plug' values shows a 6.3% premium for SpectrumC.

AR 866; see also AR 9.

Contracting Officer Gomez awarded the contract to Jacobs, again finding Jacobs' offer to represent the "best value overall to the Government."  AR 867.

**GAO's Denial of Spectrum's Second Protest**

Following the Air Force's November 17, 2015 corrective action and second source selection decision to award Jacobs the RFQ, Spectrum filed a second bid protest with GAO.  AR 1518-19.  Spectrum raised two protest grounds before GAO.[7]  AR 1514.  First, Spectrum argued that the Source Selection Authority ("SSA") - - Contracting Officer Gomez - - improperly converted the basis of award for the RFQ from best value to lowest-priced technically acceptable because price was the deciding factor for award.  AR 1520.  Second, Spectrum argued that the Agency improperly raised Jacobs' past performance technical evaluation factor from "Very Good" to "Exceptional" in its corrective action following the initial GAO protest because the Contracting Officer was not provided with any new information regarding Jacobs' past performance.  AR 1522.  On March 4, 2016, GAO denied both protest grounds.  AR 1524.

With respect to Spectrum's first protest ground - - improper conversion of a best value to a lowest-priced technically acceptable procurement - - GAO determined that the Contracting Officer sufficiently accounted for the Mission Capability factor in making award, reasoning:

> Contrary to the protestor's assertions, the record shows that the SSA not only looked beyond the overall adjectival rating assigned under the mission capability factor, but also considered the position ratings and sub-ratings underlying the overall adjectival ratings.  While she concluded that Spectrum's proposal was superior to that of Jacobs because of those underlying differences, she also was required to consider whether the particular features in Spectrum's quotation were worth the associated price premium.  The record shows that the SSA found no discriminators between the two quotations that would support a tradeoff in favor of Spectrum's higher-priced quotation.   We see no basis to substitute our judgment for the SSA's in this area.

AR 1522.

---

[7]      GAO also noted that "[a]lthough [it does] not specifically address all of Spectrum's arguments, [it has] fully considered all of them and find that they afford no basis on which to sustain the protest."  AR 1520.  Most of these arguments are reiterated in Spectrum's instant protest before the Court.

Similarly, GAO rejected Spectrum's second protest ground that the Contracting Officer arbitrarily raised Jacobs' Past Performance factor from "Very Good" to "Exceptional," reasoning:

> Here, the agency explains that after reviewing the source selection documentation as part of the corrective action, the SSA no longer agreed with the SSEB's overall rating of Jacobs under the past performance factor. The SSA disagreed with the SSEB's assignment of a very good rating, based on her disagreement with the SSEB's conclusion that one marginal rating in one area of one [Contractor Performance Assessment Report] could put the AFWET program office at risk for less than exceptional performance, notwithstanding the otherwise exceptional and very good ratings. Instead, the SSA viewed the single marginal rating for one area as "an outlier and not representative of Jacobs' body of Past Performance." Further, the SSA found the area in which Jacobs received its one marginal rating – management of key personnel – was an area for which Jacobs received exceptional ratings in the remaining six [Contractor Performance Assessment Reports]. Based on these considerations, the SSA concluded that "on the whole, Jacobs' Past Performance record was 'Exceptional' in that [she] had a very high expectation that Jacobs will successfully perform the required effort." In sum, the [Source Selection Decision Document] shows that the SSA's conclusions were reasonable and appropriately documented; she acknowledged the SSEB's concerns with regard to the marginal rating, but did not share those concerns because "on the whole" she found that Jacobs' past performance was exceptional.

AR 1523 (internal citations omitted).

GAO further noted that although the outcome of the reevaluation with respect to Past Performance following corrective action differed from the Contracting Officer's initial assessment, that change "does not constitute evidence that the reevaluation was unreasonable." AR 1520. Rather, GAO recognized that "it is implicit that a reevaluation can result in different findings and conclusions" and that the overriding concern on review is whether the evaluation results "reasonably reflect the relative merit of the offers." Id. (internal citations omitted). GAO also ruled that a source selection official may disagree with evaluation ratings of lower-level evaluators and exercise independent judgment. AR 1523. In sum, GAO found that Contracting Officer Gomez "reasonably determined that Jacobs' quotation offered the best value, and adequately documented her conclusions." AR 1524.

Twelve days after GAO's denial of Spectrum's protest, on March 16, 2016, Spectrum filed suit in this Court.

## Discussion

### Jurisdiction and Standard of Review

This Court has jurisdiction to review bid protests for the award of a government contract in accordance with the Administrative Procedure Act's standard of review for agency action. 28 U.S.C. § 1491(b)(4) (2012); 5 U.S.C. § 706 (2012). The Court will not set aside an agency's procurement decision unless the agency abused its discretion or acted arbitrarily, capriciously, or

otherwise not in accordance with law.  Adams & Assocs. v. United States, 741 F.3d 102, 105-06 (Fed. Cir. 2014).  In order to obtain relief, if this Court finds that the agency's actions were contrary to law or regulation, the plaintiff must also show that the violation was prejudicial. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005).

A protestor seeking the extraordinary remedy of a permanent injunction must establish four factors: 1) that it has succeeded on the merits, 2) that it will suffer irreparable harm if the court withholds an injunction, 3) that the balance of hardships tips in the protestor's favor, and 4) that an injunction serves the public interest.  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009).  In addition to the permanent injunction factors, the Court is obligated to "give due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3); see also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (internal citations omitted) (affording "great deference to the professional judgment of military authorities concerning the relative importance of a particular military interest" when the case involved "complex, subtle, and professional decisions as to the composition, training, equipping, and control of a military force"); Gentex Corp. v. United States, 58 Fed. Cl. 634, 655 (2003).

The Court affords an agency discretion when the procurement at issue is conducted on a "best value" basis.  See Patriot Taxiway Indus., Inc. v. United States, 98 Fed. Cl. 575, 583 (2011) (citing Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1355 (Fed. Cir. 2004)). Such discretion does not relieve an agency of its obligations to examine the relevant data and articulate a "satisfactory explanation for its action including a rational connection between the facts found and the choice made." Patriot Taxiway, 98 Fed. Cl. at 583 (internal quotation marks omitted) (citing Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co., 463 U.S. 29, 43 (1983)); In re Sang Su Lee, 277 F.3d 1338, 1334 (Fed. Cir. 2002)).  At the same time, a court may not substitute its judgment for that of the agency.  Id.  Rather, the Court's review is confined to deciding whether the agency's decision was arbitrary and capricious, irrational, or otherwise not in accordance with law.  Id.

**Spectrum Has Not Shown Success on the Merits**

Spectrum argues that the Air Force's award decision was arbitrary, capricious, and irrational based on three protest grounds:

1) The Air Force's corrective action that upgraded Jacobs' past performance rating from "Very Good" to "Exceptional" was arbitrary and capricious and without a rational basis;

2) The Air Force failed to comply with the RFQ requirements in making its best value determination by not giving due weight to the "Mission Capability" technical factor; and

3) The Air Force improperly converted the RFQ from a best value into a lowest-priced technically acceptable procurement in violation of the RFQ terms.

Compl. ¶¶ 58-107.  The Court addresses each protest ground in turn.

17

## The SSA's Upgrade of Jacobs' Past Performance Rating was Rational

Spectrum argues that the SSA's upgrade of Jacobs' Past Performance rating from "Very Good" to "Exceptional" following corrective action was irrational because the SSA made the upgrade decision without explanation or "new information regarding Jacobs." Pl.'s Mot. 18. Spectrum's argument is not borne out by the record.

As the SSA explained in detail in her second Source Selection Decision Document, with respect to Past Performance, Contracting Officer Gomez considered Jacobs' and Spectrum's proposals to be "very similar" such that both contractors should have received an "Exceptional" rating, despite the SSEB's finding Jacobs' Past Performance should be considered only "Very Good." The SSA explained her disagreement with the SSEB's "Very Good" rating for Jacobs' past performance and upgraded Jacobs' Past Performance rating to "Exceptional," stating:

> In the area of Past Performance, the Offerors' overall ratings are also misleading in that it appears SpectrumC's Past Performance record significantly exceeds JacobsTec's Past Performance record when in reality their actual Past Performance records are very similar. In the area of Past Performance, the "Exceptional" rating received by SpectrumC was based on 17 [Contractor Performance Assessment Reports ("CPARs")] individual ratings of "Exceptional", four ratings of "Very Good", and one rating of "Satisfactory" while JacobsTec rating of "Very Good" was based on 27 individual CPAR ratings of "Exceptional", four ratings of "Very Good", four ratings of "Satisfactory" and one rating of "Marginal". The Source Selection Team (SST) assigned a rating of "Very Good" to JacobsTec under Past Performance based solely on the fact that they received one "Marginal" rating in a CPAR evaluation area. I do not concur with the SST's evaluation of JacobsTec's Past Performance. While I understand the SST's concern regarding this one "Marginal" rating, I find that on the whole, JacobsTec Past Performance record is "Exceptional" in that the Government has a very high expectation that JacobsTec will successfully perform the required effort.

AR 866-67.

The record fully supports the SSA's judgment call. The "Marginal" rating at issue involved only one sub-rating in one CPAR out of the seven reviewed by the Air Force. The relevant CPAR states:

> [***]

AR 502.

The SSA rationally determined that this sole CPAR sub-rating should not taint Jacobs' otherwise exceptional past performance history. Indeed, Jacobs had 10 more "Exceptional" ratings than Spectrum. AR 867. The record supports the SSA's reasonable determination that here "the existence of isolated instances of poor performance assessments does not preclude a favorable evaluation of past performance overall." Metro Mach. Corp., 2005 CPD ¶112, 2005 WL 1458280 (Comp. Gen. Apr. 21, 2005).

Nor does the fact that the SSA changed Jacobs' Past Performance rating in her second Source Selection Decision Document render the reevaluation unreasonable.  AR 1520, 1522-23; see generally Atl. Diving Supply, Inc. v. United States, 107 Fed. Cl. 244, 256 (2012) ("[C]hanges in the [offerors'] scores upon reevaluation were to be expected in light of the Agency's decision to correct previous evaluation errors") (citing Vanguard Recovery Assistance v. United States, 101 Fed. Cl. 765, 786 (2011)).

**The Air Force Rationally Weighed the Mission Capability Factor in Making its Best Value Determination**

Spectrum alleges that the Agency improperly downplayed the Mission Capability factor in two respects, by improperly dismissing or minimizing the Mission Capability sub-factor ratings and by failing to conduct a proper tradeoff analysis between Mission Capability and Cost/Price.

**The Air Force Reasonably Accounted for Spectrum's Strengths in Mission Capability in its Post-Corrective Action Decision**

Spectrum contends that the SSA "dismiss[ed] or minimize[d] the very technical discriminators that the [SSEB] identified as strengths without explaining the basis for the disagreement."  Pl.'s Mot. 14.  Spectrum posits that the SSA only made "general statements of equivalency" with respect to the Mission Capability factor without properly comparing the "relative merits of the proposals."  Id. at 15.

The record does not support Plaintiff's argument.  The SSA found that Jacobs' Mission Capability was not equivalent to Spectrum's, and took into account Spectrum's superior sub-factor ratings - - acknowledging that Spectrum had 12 out of 37 sub-factors in Mission Capability rated as "Very Good," whereas Jacobs had only 2 out of 37 sub-factors rated as "Very Good."  The SSA's second Source Selection Decision Document evidences that the SSA looked closely at the differences between these sub-factor ratings, recognized Spectrum's superior Mission Capability rating, but determined it was not worth the extra price premium.  AR 866-67.  This is precisely the type of judgment call an SSA is entitled to make in a best value determination.

The SSA provided a coherent explanation for her decision to award to Jacobs despite Spectrum's higher Mission Capability technical rating based on her independent review of the sub-factors and Jacobs' lower price.  The SSA's explanation is more than sufficient to satisfy the FAR Subpart 8.405 documentation requirement.  See Matt Martin Real Estate Mgmt. LLC v. United States, 96 Fed Cl. 106, 116-17 (2010) ("FAR Subpart 8.4 and FAR Part 15 are different provisions with different purposes.  The amount of documentation necessary in FAR Subpart 8.4 procurements does not rise to the level required by FAR Part 15."); Allied Tech. Grp., Inc. v. United States, 94 Fed. Cl. 16, 50 (2010) (recognizing that the purpose of FAR Part 8.4 is to offer a "more simplified and flexible approach away from the more formal and rigorous procedures for negotiated procurements" under FAR Part 15).

The Court will not "second guess" the SSA's integrated best value assessment or independent review of the minutiae of the SSEB's technical ratings.  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (internal citations omitted) (holding that bid protest

challenges "deal[ing] with the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess"); A-T Sols., Inc. v. United States, 122 Fed. Cl. 170, 185 (2015) (declining to "second-guess" the technical expertise of a procurement official's decision rating which tracking software toolkit was superior among various offers); Commc'n Constr. Servs., Inc. v. United States, 116 Fed. Cl. 233, 266 (2014) (internal citations and quotation marks omitted) ("As the Federal Circuit has recognized, challenges to the technical scoring involve the minutiae of the procurement process, discretionary determinations that a court will not second guess.").[8]

In sum, the SSA reasonably weighed the Mission Capability technical factor and sufficiently documented her rationale in the second Source Selection Decision Document. AR 866-67.

### The SSA Performed an Adequate Best Value Tradeoff Analysis

Spectrum argues that the SSA failed to properly conduct a meaningful tradeoff analysis because she failed to "engage in a meaningful, comparative consideration of the technical differences of Spectrum's and Jacobs' proposals or to explain why the Agency failed to choose a technically superior contractor to perform these exacting requirements when the price difference was less than five percent . . . ." Pl.'s Reply 2.

Contrary to Plaintiff's assertion, the SSA has provided a reasoned explanation on her tradeoff decision - - she did not believe the advantages in Spectrum's proposal outweighed the lower price in Jacobs' technically inferior, but perfectly adequate proposal. In her detailed post-corrective action source selection decision, the SSA pointed out that Spectrum's quote represented a 6.3% price premium and that Spectrum's advantages in Mission Capability did not warrant that price premium. AR 627, 866. Spectrum's disagreement with the SSA's exercise of discretion does not warrant the radical relief Plaintiff seeks. Banknote Corp. of Am., Inc. v. United States, 56 Fed. Cl. 377, 384 (2003), aff'd, 365 F.3d 1345.

### The Air Force Did Not Convert this Best Value Procurement to an LPTA Buy

Spectrum argues that because price became a determinative factor for award, the SSA improperly conducted the procurement on a lowest-priced technically acceptable basis. Pl.'s Mot. 21. Spectrum posits that "by ignoring and otherwise neutralizing the many technical advantages proposed by Spectrum over Jacobs, [the SSA] effectively elevated the relative importance of Price and converted the best value procurement contemplated under the RFQ into one based on low price and mere technical acceptability, as opposed to technical superiority." Id. at 22. Because the SSA fully considered the technical and past performance attributes and

---

[8]     Spectrum relies on FirstLine Transportation Security, Inc. v. United States, 100 Fed. Cl. 359, 368 (2011), but that case is distinguishable. In FirstLine, the Court found that the Transportation Security Administration irrationally awarded a contract to an inferior lower-priced offeror that had one technical strength and one weakness, while the protestor had 33 strengths and no weaknesses. FirstLine involved a FAR Part 15 best value procurement, the technical differences between the awardee's and protestor's proposals were significant, and the SSEB failed to articulate a coherent account of the technical differences between the competing proposals. Id.

inferiorities of the proposals as well as the price differential, she reasonably conducted a best value tradeoff analysis. The SSA's conclusion that Spectrum's superior proposal did not warrant a price premium did not convert this best value procurement into an LPTA procurement. In short, the Agency was required to consider price in its integrated best value assessment and properly did so.

**Other Factors For Injunctive Relief**

Because Plaintiff has wholly failed to demonstrate success on the merits of its protest the Court need not address the remaining factors for injunctive relief. Int'l Res. Recovery, Inc. v. United States, 64 Fed. Cl. 150, 164 (2005) ("A plaintiff that cannot show that it will actually succeed on the merits of its claim cannot prevail on its motion for injunctive relief."); Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 176 (2005).

That said, an additional consideration supports denying injunctive relief here. The Government has established that an injunction could result in significant harm to national security interests. In resolving bid protests the Court must give "due regard to the interests of national defense and national security and the need for expeditious resolution of the action." 28 U.S.C. § 1491(b)(3). The AFWET Program involves important issues of national security as it supports communications for military operations of the Army, Navy, and Coalition forces abroad. Cf. Gentex Corp., 58 Fed. Cl. at 655 ("Where a solicitation addresses issues of national defense, as it does here, the importance of this factor is inflated.").

The AFWET modernization program is already underway at three locations, and five additional locations are pending. Patterson Decl. ¶ 2. Delaying the transition of the workforce from Spectrum to Jacobs until mid-summer, when a total of seven simultaneous AFWET terminal upgrades will be underway - - as opposed to the three currently underway - - would be deleterious to the Government and the public interest. Id. As Shawn Patterson, the AFWET program manager and chair of the SSEB for the instant procurement testified, "the exceptional risk to the government of transitioning to a new contract in the middle of seven concurrent [Modernization of Enterprise Terminal] installs represents an incredibly high likelihood of failure for both the projects and missions they support." Id. at ¶ 7. So too, as described by Mr. Patterson, this product support services contract for AFWET is "an incredibly complicated dance of coordinating plumbers, welders, crane operators, testing activities, trainers, global shipping, and balancing numerous unique constraints due to location and high security. If one aspect of the program underperforms the entire project may hemorrhage funding and schedule." Id. at ¶ 5.

**Conclusion**

Plaintiff's requests for a permanent injunction, declaratory relief, and bid and proposal costs are **DENIED**.

The Clerk is directed to enter judgment on the Administrative Record in favor of Defendant consistent with this Opinion.

s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**